United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Department of Homeland Security, Immigration and Customs Enforcement, Petitioner<br><br>v.<br><br>Armen Ayvazian, Miqaad Bashir, Muhammed Waqas, Lugman Khan, and Tasawar Malik, Respondents | )<br>)<br>)<br>)<br>) Civil Action No. 15-23213-Civ-Scola<br>)<br>)<br>)<br>) |

### Order Granting in Part Immigration And Customs Enforcement's Petition For Emergency Court Order To Allow Involuntary Administration Of Nutrients

The Respondents in this case are immigration detainees held at the Krome Detention Center who began hunger strikes in August 2015 to protest their treatment in connection with their immigration proceedings. Previously, the Court granted the Bureau of Immigration and Customs Enforcement's (ICE) request for an emergency order to allow it to conduct involuntary blood draws, urinalysis, weigh-ins, and routine medical examinations to monitor the Respondents' health during their hunger strikes. The results of these examinations would alert ICE and the Court if the Respondents' health had deteriorated to a point where an order requiring forced feeding would need to be entered.

The Court held a hearing on September 1, 2015. At the hearing, Respondent Lugman Khan was unable to attend due to his hospitalization for gall bladder problems resulting from his refusal to eat and several of the other Respondents requested additional time to coordinate with their attorneys in order to formulate a considered response to the Government's petition. At that hearing, a medical doctor testified that if the Respondents hydrated themselves, their health would not be in significant jeopardy for about 10 days even if they continued with their hunger strikes. Upon inquiry by the Court, each of the four Respondents who were present agreed to hydrate themselves. Thus, the Court reset the hearing for September 10, 2015.

### 1. Proceedings at the September 10, 2015 Hearing.

At the September 10 hearing, two of the Respondents—Armen Ayvazian and Miqaad Bashir—announced that they were *not* continuing their hunger strikes. Both Ayvazian and Bashir informed the Court that they were representing themselves at the hearing. They stated that they have been eating

and hydrating and that they will continue to do so. The Government announced that it would dismiss Ayvazian and Bashir from this action by September 17, 2015, provided they continue to eat and hydrate. In light of these facts, the Court **suspends** the emergency order allowing for involuntary medical examinations as to Ayvazian and Bashir as long as they continue to voluntarily eat foods and drink fluids. If Ayvazian and Bahir continue to voluntarily eat foods and drink fluids, ICE shall dismiss them from the Petition on September 17, 2015.

The Court then asked the remaining Respondents about the status of their representation and the status of their hunger strikes. Tasawar Malik's immigration attorney (Wendy Jerkins) appeared at the hearing, but informed the Court that she could not represent Malik in this action. Two other attorneys, from the American Civil Liberties Union, appeared but also indicated that they were not prepared to present any argument or evidence to the Court at this time. They requested more time to determine whether they would enter an appearance on behalf of one or more of the Respondents or perhaps to file an amicus brief in support of their positions. Malik told the Court that he was continuing with his hunger strike and that he would not eat or hydrate himself unless his immigration case is handled differently. But, the Court had already continued the hearing for 9 days for the sole purpose of allowing the Respondents to make arrangements for their representation at a contested hearing. Because of the seriousness of the health issues Malik is facing due to his refusal to eat or drink, the Court determined that it would proceed forward with the hearing without further delay.

Muhammed Waqas and Lugman Khan both announced that they would represent themselves. They further informed the Court that they would continue with their hunger strikes unless their immigration cases are handled differently. The Court welcomes the future appearance of attorneys to represent any of the Respondents, but it could not postpone its decision any longer because of the urgency created by the Respondents' lengthy hunger strikes.

Prior to going forward with the hearing, the Court determined that although each of the Respondents was in a somewhat weakened physical state, each was able to think clearly, properly respond to the Court's inquiry and each was capable of representing himself at the hearing.

  2. **Testimony of Dr. Luis A. Ortega.**
   During the hearing, ICE presented testimony from Dr. Luis A. Ortega, M.D., U.S. Public Health Service, the Clinical Director of the Krome Medical Referral Center at the Krome Service Processing Center. Dr. Ortega is the

supervising physician and is responsible for the medical care of the Respondents.

Dr. Ortega testified that a *hunger strike* is deemed to be in effect after nine consecutive meals are refused; in other words, after three days of not eating. This timeframe is significant because after about three days the body exhausts its glucose supply and begins using fat for energy. Once the body fat is exhausted, the body uses proteins for energy. This leads to the breakdown of muscles—including the heart. The body then enters a state of ketosis, which suppresses the appetite. Dr. Ortega explained that a normal person, standing 5'10" and weighting 155 lbs could last up to 2–2.5 months without eating; an obese person can survive up to a year (although, the Court notes that all three of these Respondents are of slim build). But, Dr. Ortega cautioned, a person will survive only about seven days if they are also not hydrating.

Explaining the stages of starvation, Dr. Ortega noted that chronic end-stage renal failure can ensue. All muscle tissue—including cardiac muscle tissue—is destroyed. As a result, a frequent cause of death in a starvation victim is arrhythmia. Other health effects of prolonged hunger strikes include the acute loss of vitamin-B reserves which causes Wernicke's encephalopathy. Dr. Ortega told the Court that blood and urine tests are vital to determine if the body is in a state of distress.

Dr. Ortega also testified about the current health of each of the remaining Respondents: Waqas, Khan, and Malik. Waqas has lost 13% of his initial body weight. He has been transported to an emergency treatment center twice. The first time he refused any care; the second time he accepted fluids through an IV. Waqas has been more listless and hard to arouse. He was only able to attend the hearing today because he accepted the fluid IV and water. Dr. Ortega explained that Waqas needs nourishment; without water and nutrients, he will continue to deplete his energy reserves, and face the serious and life threatening health effects associated with prolonged starvation.

According to Dr. Ortega, Khan has lost 16% of his initial body weight. He has a gall-stone problem that could be life threatening. He was taken to an emergency treatment center for his gall-stone problem and surgery was recommended, but he refused treatment. His lab results show that he is already suffering kidney problems. He is very weak and needs to gradually increase his nutrient intake under medical supervision, or he will face the serious and life threatening health effects associated with prolonged starvation.

Dr. Ortega testified that Malik has lost 19% of his initial body weight. At 20% loss, the damage to the body's organs is unrepairable. At 30%, he will suffer organ failure that is incompatible with life—in other words, he will die.

In summary, ICE presented evidence, through Dr. Ortega, that the

medical conditions of the three respondents who remain on a hunger strike—Waqas, Khan, and Malik—have deteriorated to the point where involuntary administration of nutrients is necessary in order to preserve their lives. Dr. Ortega testified that the laboratory results for Waqas, Khan, and Malik indicated that initial signs of organ damage, due to the lack of nutrition, was occurring. Dr. Ortega's medical opinion was that administration of nutrients, through a nasogastric tube, was medically necessary to preserve their lives, and that the administration of nutrients should occur as soon as possible, under careful medical supervision.

### 3. Testimony of Joel Mikelson.

The Court also heard testimony from Joel Mikelson, who is essentially the warden of the Krome Service Processing Center. Mikelson explained that Krome has 500 detainees in removal proceedings or in the process of being removed. ICE employees work there, as well as contract security staff. There is an immigration court at Krome with two immigration judges.

Mikelson explained that hunger strikes put a strain on the limited resources available to operate Krome. In fact, two of the Respondents have already required hospitalization due to the hunger strikes. The costs of transportation to and from the hospital and medical care is not insignificant. Mikelson testified that the death or injury of any detainee as a result of a hunger strike would seriously affect the operation of Krome and would adversely affect ICE's efforts to maintain the security and good order of this detention facility. He explained that a detainee's hunger strike can affect the morale of other detainees by suggesting to them that they too should go on a hunger strike. Also, the hunger strikers must be kept in separate housing areas, and that may lead to other detainees have less freedom of movement. He also explained that detainees expect to get proper medical treatment, and if a hunger striker dies, other detainees may lose faith in the staff which may lead to them to not report their own medical issues. Hunger strikers can also cause other detainees to stop following orders. Other detainees and members of the public would also believe that the staff had callously allowed the hunger strikers to commit suicide.

Mikelson testified that detainees had Krome had a variety of avenues available to them to voice their concerns. Detainees have access to a telephone and the mail, through which they may contact the media and publicize their grievances. There are even established procedures which would allow for a member of the media to interview a detainee at the facility.

Each of the Respondents was given a full opportunity to present testimony and argument to the Court. Each Respondent espoused the same

position: "I am being treated inhumanely by the Immigration Court and should be released to fight my immigration case in a proper court." None of the Respondents expressed any complaints about being restricted in their ability to air their complaints to the public, the Krome Detention Center or the Immigration Court by means less drastic than their hunger strikes.

### 4. Legal Standards

Based on the Respondents' statements, the Court understands them to assert three constitutional rights: (1) the right to free speech, (2) the right to petition the Government for redress of grievances, and (3) the right to refuse unwanted medical treatment. *See,* U.S. Const. amend. I; *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990) (articulating a constitutionally protected liberty interest to refuse unwanted medical treatment).

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987). But custodial institutions may implement regulations that infringe upon a detainee's constitutional right, as long as the regulations are "reasonably related" to legitimate security interests. *Id.* at 91. Courts look to several factors in deciding whether a regulation is reasonable:

> (1) whether there is a valid, rational connection between the regulation and a legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; (3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates, and the allocation of prison resources generally; and (4) whether the regulation represents an exaggerated response to prison concerns.

*Hakim v. Hicks*, 223 F.3d 1244, 1247-48 (11th Cir. 2000) (internal quotation marks omitted).

Other federal courts have determined that an immigration custodial facility's determination that it is medically necessary to force-feed a detainee on a hunger strike does not violate the detainee's constitutionally protected rights. *See, e.g., In re Soliman*, 134 F. Supp. 2d 1238, 1253–54 (N.D. Ala. 2001), *vacated as moot Soliman v. United States*, 296 F.3d 1237 (11th Cir. 2002); *accord In re Fattah*, No. 08-MC-164, 2008 WL 2704541, at *3–4 (M.D. Pa. July 8, 2008).

### 5. Findings and Conclusion.

Applying the reasonableness factors to this case, the Court finds that there is a valid, rational connection between compulsory medical examinations

and force-feeding the Respondents and ICE's interests keeping the Respondents alive in good health and maintaining order and security at Krome. The Court also concludes that the Respondents have alternative, less disruptive means to protest their detention and exercise their First Amendment rights. They may communicate with the media and others in the community to complain about their detention, and they may appeal the adverse immigration decisions in their cases. Next, the Court finds that the Respondents' hunger strikes have already, and will continue to have a heavy administrative burden on the staff at Krome, other detainees at Krome, and ICE's allocation of resources in general. Finally, the Court concludes that compulsory medical examinations and force-feeding the Respondents is not an exaggerated response to their hunger strikes. The Respondents' decision to engage in these hunger strikes have presented ICE with three options: (1) allow them to die, (2) force-feed them, or (3) submit to their demands and release them. Options 1 and 3 are not reasonable. This leaves ICE with the single option of involuntarily administering nutrients and hydration to the Respondents. Thus this measure is not an exaggerated response—it is the only viable response. Additionally, the method proposed by ICE, nasogastric tube, appear to be the least invasive means of force-feeding. *See In re Soliman*, 134 F. Supp. 2d at 1254.

After considering the petition, including ICE's request to permit compelled feeding and hydration, the record, the testimony presented at the September 10, 2015 hearing, including all of the statements made by the Respondents, and the relevant legal authorities, the Court finds that an emergency condition exists, because the refusal of Respondents Waqas, Khan, and Malik, to eat has caused a significant deterioration in their physical conditions. Further, the Court finds that Respondents' refusal to eat has seriously jeopardized their health, to the point that they are not likely to survive without the compelled feeding of nutrients.

The Respondents repeatedly complained that ICE was treating them inhumanely. But, as the Court sees it, it would be inhumane to simply let them die—an outcome that is certain to occur if they are not given nutrients and hydrated. The Respondents have made their positions clear: they will continue with their hunger strikes unless they are released from detention and allowed to fight their immigration cases while on parole. But this Court does not have the authority to require the immigration court to parole these Respondents. The only question that is before this Court is whether ICE may conduct medical examinations against the Respondents' will, and if ICE can involuntarily administer nutrients and hydration to the Respondents to prevent them from dying. Given the situation, the Court concludes allowing ICE to

force-feed the Respondents is the only correct answer to the issue presented in this case—both legally and morally

The Court **grants** ICE's petition.  The Court authorizes ICE, through competent medical authority, to involuntarily administer nutrients to respondents Muhammad Waqas, Lugman Khan, and Tasawar Malik, through a nasogastric tube or intravenous line.  Further, the Court authorizes ICE, through competent medical authority, to restrain these Respondents if they attempt to remove the nasogastric tube and/or intravenous line.

As a final note, the Court implores the Respondents to cooperate with the medical staff at Krome and to end their hunger strikes.  If their intent was to bring attention to their case, they have already succeeded.  Continuing on their hunger strikes beyond this point can only serve to cause them serious, permanent injury or death.

This Order shall remain in effect until **December 3, 2015**.  The Court requires ICE to file a *Status Report* on October 8, 2015, November 5, 2015, and November 23, 2015.

**Done and ordered** at Miami, Florida on September 11, 2015.

_____
Robert N. Scola, Jr.
United States District Judge